UNITED STATES of America,
Plaintiff–Appellee,

v.

Grover Cleveland BARNES,
Defendant–Appellant.

No. 89–2120.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 13, 1989.
Decided Aug. 9, 1990.

Gwenn R. Rinkenberger, Kevin E. Milner, Andrew B. Baker, Jr., Asst. U.S. Attys., Hammond, Ind., for plaintiff-appellee.

Caroline B. Briggs, Flora, Ind., for defendant-appellant.

Before WOOD, Jr., COFFEY and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Defendant Grover C. Barnes appeals his conviction on one count of possession with intent to distribute cocaine, heroin and marijuana in violation of 21 U.S.C. § 841(a)(1) and two counts of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). We affirm.

## I.

On December 24, 1987, Officer Michael Snodgrass of the Gary (Indiana) Police Department ("GPD") stopped the defendant Barnes and two other individuals when he observed that their car had an altered temporary license plate. When Barnes, the operator of the vehicle, stepped out of the vehicle, Officer Snodgrass observed an object protruding from Barnes' jacket pocket. Fearing that the object might be a weapon, Officer Snodgrass ordered Barnes to place his hands on the hood of the squad car and proceeded to conduct a "pat down" search of Barnes' person. As Officer Snodgrass began the "pat down" search, Barnes raised up and reached for his pocket. Snodgrass drew his revolver, ordered Barnes to remain against the car, and called for assistance on his portable radio. GPD Officer Charles Zacek, among other GPD officers, responded to Snodgrass' call and, upon arriving at the scene, held Barnes at gunpoint, while Snodgrass directed the other two individuals to exit the car. After Snodgrass informed Officer Zacek that Barnes needed to be searched for weapons, Zacek continued the "pat down" search of Barnes, discovering a number of bullets and a .38 caliber Charter Arms Revolver in his pocket. Snodgrass returned to his squad car, where he allegedly observed a green shower cap containing packages of white powder (determined to be cocaine) on the hood of the car near the area where Snodgrass had conducted the initial "pat down" search of Barnes.[1] The officers placed Barnes and the other occupants of the car under arrest and transported them to the Gary police station, where they were processed on state narcotics and firearms charges. These charges were later dropped.

Approximately seven months later, on July 15, 1988, FBI Agent Mark Becker, after receiving information from two government informants that they believed that Barnes was selling narcotics at his residence in Gary, applied for and received a search warrant for Barnes' residence.[2]

---

1. Snodgrass took the shower cap containing cocaine into his possession and ingested some of the cocaine later that same evening. After the shower cap and cocaine were discovered missing, Snodgrass was ordered to submit to a blood test, which revealed the presence of cocaine. Snodgrass thereafter resigned from the Gary police force.

2. The record reveals that the FBI investigation of Barnes was not premised on the December 24, 1987, automobile stop because the Bureau was unaware of this incident until after the

Agent Becker, accompanied by other FBI agents, executed the warrant later that day. Upon arriving at Barnes' residence, Agent Becker observed four men, one of whom was the defendant Barnes, standing near a group of dog kennels approximately thirty feet from the house designated to be searched. Agent Becker detained the four individuals while other FBI agents conducted the search of the house. During the course of the search, the agents recovered quantities of cocaine, heroin and marijuana (including a seven-foot marijuana plant growing against the house), as well as items typically used for the processing of drugs, such as scales and "cutting" and packaging materials. In addition, the agents discovered a notebook containing customer lists and records of drug transactions, a loaded 9 mm pistol, a shotgun and ammunition. Upon completing the search of the house, the agents arrested Barnes and took him into custody.[3]

On July 22, 1988, a grand jury indicted Barnes on two counts of possession of narcotics with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Counts I and III) and two counts of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Counts II and IV).[4] Counts I and II dealt with the cocaine and firearms recovered in the December 24, 1987, traffic stop. Counts III and IV were premised upon the heroin, marijuana, cocaine and weapons recovered in the search of Barnes' house on July 15, 1988. On July 27, 1988, Barnes was arraigned before a United States Magistrate, and entered a plea of not guilty to all charges. Trial was scheduled for September 19, 1988,[5] before Judge James T. Moody, and the parties

were given ten days to file pre-trial motions.

Although no motions were filed during this ten-day period, on September 9, 1988, Barnes filed a motion to suppress evidence, arguing that the cocaine and the Charter Arms Revolver found during the December 24, 1987, traffic stop were illegally seized because the GPD officers did not have a reasonable basis for performing the "pat down" search of Barnes and that Barnes' warrantless arrest was not supported by probable cause. Barnes also argued that the narcotics and firearms seized at the July 15, 1988, search of his home should be suppressed because the search warrant Agent Becker obtained was not supported by "sufficient probable cause." After a hearing on Barnes' motion to suppress on November 18, 1988, the district court, on December 19, 1988, found that the "pat down" searches conducted by Officers Snodgrass and Zacek were reasonable and justified under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) in light of the suspicious-appearing "heavy object" Snodgrass observed in Barnes' pocket, as well as Barnes' unanticipated movement in attempting to reach for his pocket during the initial "pat down" search. Thus, because Zacek seized the Charter Arms Revolver during the lawful "pat down" search, the court denied the suppression motion as to the revolver, and, furthermore, found that the discovery of the revolver justified Barnes' warrantless arrest. However, the court granted the motion with respect to the cocaine found on the hood of Snodgrass' squad car, finding that the government had failed to establish to the court's satisfaction that the cocaine was seized during the "pat down" search

---

warrant was executed and Barnes was arrested on July 15, 1988. Shortly thereafter, FBI agents interviewed former GPD Officer Snodgrass regarding the December 24 incident and federal charges based thereon were filed. Snodgrass testified at the suppression hearing, discussed *infra,* and at trial pursuant to a grant of immunity that he would not be prosecuted for retaining police evidence (the shower cap and cocaine) on December 24 and ingesting the cocaine later that evening. *See supra* note 1.

3. The record does not reflect whether the other three individuals were arrested in connection with the search of Barnes' residence.

4. It is undisputed that Barnes was convicted of illegal possession of a firearm on May 14, 1982 in the Northern District of Indiana.

5. This trial date was postponed pending the resolution of Barnes' motion to suppress evidence, discussed *infra.* Barnes' trial commenced on January 23, 1989.

or a search incident to Barnes' arrest because there was no evidence of when and how the cocaine was seized, much less the source of the seized cocaine. The court also found that Agent Becker's affidavit detailing the evidence of Barnes' narcotics dealings was sufficient to support a finding of probable cause to search his residence and, thus, denied Barnes' motion to suppress the firearms and narcotics confiscated in the July 15 search. Shortly after the court's ruling, the government dismissed Count I of the indictment, and the indictment was amended to reflect that only three charges—namely, two counts of possession of firearms by a convicted felon and one count of possession with intent to distribute the cocaine, heroin and marijuana found in Barnes' home during the search of July 15, 1988—were pending against the defendant Barnes.

Four days prior to trial, on January 19, 1989, a prospective witness informed the United States Attorney's Office that Barnes had placed a contract out on his attorney's life. The United States Attorney's Office, in turn, notified defense counsel of this information. Prior to trial, however, defense counsel informed the court, at Barnes' request, of the alleged "contract," stating that: "I'm happy to report I have been informed in fact there is no hit out for me. I believe that to be the case." The court accepted defense counsel's statements and did not inquire further into the matter.

On the first day of trial, January 23, 1989, the defendant filed a motion to dismiss the indictment, arguing that of the 180 days between his arraignment and the commencement of trial, only 106 were excludable under 18 U.S.C. § 3161(h), thus violating his right to be brought to trial within 70 days as prescribed by the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* The district court denied the motion, finding

that, due to time allocated for the filing and consideration of various pretrial motions, 116 days were excludable [6] and, thus, that Barnes' trial had commenced on the 64th day after the arraignment, well within the Speedy Trial Act's 70-day time period.

Also on the first day of trial, Barnes submitted three letters he had written to defense counsel setting forth his belief that Judge Moody was prejudiced against him based on his previous court appearances before Judge Moody, and requested that the trial judge recuse himself. After defense counsel informed the court that he had read the letters and advised Barnes that, in his opinion, recusal was not warranted, Judge Moody denied the motion, stating:

"Number one, the motion is not timely the morning of trial. It's just too late under the rules.

Number 2, the motion is procedurally inadequate. There is no affidavit from the Defendant. Second, there's no certificate of good faith from his lawyer.

And on the merits, even assuming everything in Barnes' letter is true, [it] does not demonstrate any personal bias on my part against Barnes.

Barnes' complaint in essence is that I have seen him in a judicial capacity before, and that is not enough for recusal."

On the second day of trial, January 24, 1989, two jurors, Sheila Herron and Lenwood Madison, arrived late for that day's proceedings. During the court's *voir dire* examination,[7] juror Herron stated that her van had been vandalized the previous evening and that juror Madison had given her a ride to the courthouse, after learning she had experienced "car trouble." The court asked juror Herron whether she could "set that experience aside" and remain fair and impartial in considering the evidence

---

**6.** Specifically, the court found the following time periods were excludable from the 180 days between Barnes' arraignment and trial: four days for Barnes' motion to revoke the court's detention order; 102 days resulting from Barnes' motion to suppress evidence; and the ten day period set aside for the filing of pretrial motions.

**7.** The court's special *voir dire* questioning of the two jurors was conducted out of the presence of the other members of the jury, but in the presence of the Assistant United States Attorney, defense counsel and the defendant Barnes.

presented, and she responded in the affirmative. Juror Madison informed the court that he had given Herron a ride because "someone tried to steal her van last night, and she had to make out ... a police report." Juror Madison also assured the court that he would not consider this incident in his deliberations and could remain fair and impartial in considering the case against the defendant Barnes. The court, without objection from the attorneys or the defendant, allowed jurors Herron and Madison to remain on the jury.

On January 27, 1989, the jury returned verdicts of guilty against Barnes on all three counts of the amended indictment. On May 19, 1989, the district court sentenced Barnes to a term of thirty-seven months' imprisonment on each count, to be served concurrently with one another, and ordered him to pay a fine of $6,000. Barnes appeals his conviction and fine, arguing that: (1) The trial court erred in denying his motion to dismiss the indictment based on the Speedy Trial Act; (2) the government violated his right to effective assistance of counsel by informing defense counsel that the defendant had placed a "contract" on his life; (3) the district court erred in denying his motion to suppress the Charter Arms Revolver seized at the December 24, 1987, traffic stop; (4) the search warrant for the July 15 search was not supported by probable cause, nor did it describe the premises to be searched with sufficient particularity; (5) the court erred in admitting in evidence the notebook containing customer lists and drug transaction records seized during the July 15, 1988, search of Barnes' home; (6) the district court denied Barnes his right to a fair trial by failing to remove jurors Herron and Madison from the jury; and (7) the district court erred in failing to conduct a hearing on his motion for recusal of the trial judge.

## II.

█ Barnes initially contends that the district court erred in refusing to dismiss the indictment pursuant to the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*

"The Speedy Trial Act generally requires that trials in criminal cases commence within 70 days of the filing date of the information or indictment, or from the date of initial appearance, whichever last occurs. 18 U.S.C. § 3161(c)(1). However, the Act provides that several periods of time may be excluded from this 70–day period. 18 U.S.C. § 3161(a)."

*United States v. Vega,* 860 F.2d 779, 786 (7th Cir.1988). Among the permitted exclusions is "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F).

Barnes' initial appearance before a judicial officer occurred at his arraignment on July 27, 1988, and his trial commenced 180 days thereafter, on January 23, 1989. Barnes concedes that the trial court properly excluded the four days resulting from his motion to revoke the trial court's detention order, as well as the 102 days resulting from his motion to suppress evidence, from the computation of the 70–day period. The main thrust of the defendant's argument is that the trial court improperly excluded the 10–day period the magistrate set aside for the preparation and filing of pretrial motions.

In *United States v. Montoya,* 827 F.2d 143, 153 (7th Cir.1987), this court held that the amount of time set aside by a district court for the preparation and submission of pretrial motions is excludable "delay resulting from other proceedings" under 18 U.S.C. § 3161(h)(1), regardless of whether the time is granted *sua sponte* or pursuant to the defendant's request. Barnes argues that our holding in *Montoya* is inapplicable to the facts of this case because the trial court excluded the 102 days resulting from his·motion to suppress evidence from the calculation of the 70–day time period. According to Barnes, the 102–day period was "the actual time spent for motions" and, thus, the initial 10–day period, during which no motions were filed, should not constitute an additional exclusion under the Speedy Trial Act.

Our reading of *Montoya* reveals that this argument is, at best, meritless and may even be considered as being frivolous. In *Montoya*, we explicitly distinguished between the time resulting from the filing of pretrial motions, *see* 18 U.S.C. § 3161(h)(1)(F), and "time allowed for preparation of the motion, which occurs before 'the filing of the motion.'" *Id.* at 153 n. 10. We also stated that "[w]hether a defendant actually files a motion or not [during the preparation period] is immaterial as the time served the purpose of allowing the defendant to consider what was in his best interests." *Id.* at 153. Moreover, in *United States v. Latham*, 754 F.2d 747, 752 n. 4 (7th Cir.1985), a case relied upon by the *Montoya* court, we held that the initial time period the district court allowed for the preparation and filing of motions is excludable under the Speedy Trial Act, as well as time resulting from motions filed after the initial time period has expired. Thus, Barnes' claim falls squarely within our holdings in *Montoya* and *Latham*, and the trial court properly excluded both the 10–day period allowed for the preparation of pretrial motions and the 102–day period resulting from Barnes' motion to suppress evidence. Accordingly, we hold that the trial court's denial of Barnes' motion to dismiss the indictment based upon the Speedy Trial Act was proper.

### III.

Barnes next contends that the government interfered with his sixth amendment right to counsel by informing defense counsel of the "contract" Barnes had allegedly placed on his life. According to Barnes, this information undermined the attorney/client relationship because it created a conflict between defense counsel's interest in his own personal safety and his duty to maintain undivided loyalty to his client. Barnes also contends that the district court erred in failing to conduct a hearing on the effect the "contract" information would have on defense counsel's ability to represent Barnes once the matter was brought to the court's attention.

It is well settled that "[a] criminal defendant is entitled to counsel whose undivided loyalties lie with the client." *United States v. Ellison*, 798 F.2d 1102, 1106 (7th Cir.1986); *United States v. Noble*, 754 F.2d 1324, 1333 (7th Cir.1985); *United States ex rel. Williams v. Franzen*, 687 F.2d 944, 948 (7th Cir.1982). Thus, a criminal defendant may premise a claim of ineffective assistance of counsel on the fact that his attorney was burdened by a conflict of interest. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). "Although the issue of conflict typically arises in a case involving joint representation, it may also arise when a client's interest conflicts with that of his attorney." *Ellison*, 798 F.2d at 1106–07. The sixth amendment requires that trial courts, upon a defendant's timely objection that a conflict exists, hold a hearing to determine whether the potential conflict jeopardizes his right to counsel. *Holloway*, 435 U.S. at 486–87, 98 S.Ct. at 1179–80. However, when no objection is presented to the trial court, "a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel." *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718. Thus, in order to establish constitutionally ineffective assistance of counsel based on an alleged conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348, 100 S.Ct. at 1718.

In the present case, Barnes failed to raise an objection prior to or during the trial to defense counsel's representation based on the "hit contract" information received from the United States Attorney's Office. Prior to trial, defense counsel, at Barnes' request, informed the court that the United States Attorney's Office had conveyed the "contract" information, that Barnes had informed him that "there [was] no hit out for [him]," and that he "believe[d] that to be the case."[8] Although

---

8. We note that, prior to defense counsel's communication of the "contract" information to the

the matter was brought to the attention of the trial judge, this does not change the fact that Barnes is attacking his attorney's representation for the first time on appeal. In any event, it is apparent from his remarks that, after discussing the matter with his client, defense counsel was convinced that there was no contract out on his life. Nonetheless, Barnes speculates that "[a]n attorney surely would feel some suspicions of a client who he has been told is attempting to kill him." However, the Supreme Court has recognized that an attorney confronted with a possible conflict of interest " 'is in the best position professionally and ethically to determine when a conflict of interests exists or will probably develop at trial.' " *Holloway*, 435 U.S. at 485, 98 S.Ct. at 1179 (citation omitted). Moreover, "defense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem." *Id.* at 485–86, 98 S.Ct. at 1179. We are of the opinion that Barnes' claim is meritless as he has failed to present anything of substance to support his theory that his attorney harbored any suspicion toward him regarding the "hit," nor has he directed our attention to any action or decision of defense counsel giving credence to the alleged conflict of interest. Because Barnes has presented nothing more than speculative, self-serving arguments, we refuse to delve into the wide chasm of speculation and look beyond his attorney's statement to the trial court that he believed that a "contract" had not been placed on his life. Thus, we conclude that Barnes has failed to demonstrate that "an actual conflict adversely affected his lawyer's performance," and hold that Barnes' claim that he was deprived of his sixth amendment right to effective assistance of counsel must fail. Consequently, Barnes' claims that the government "undermined" his relationship with his attorney by communicating the "contract" information to defense counsel,[9] and that the trial court erred in not holding a hearing after defense counsel assured the court that no "contract" existed are without merit.

## IV.

Barnes next contends that the trial court erred in denying his motion to suppress the Charter Arms Revolver seized during GPD Officer Zacek's "pat down" search of Barnes at the December 24, 1987, traffic stop. Barnes' argument is that, in light of the trial court's suppression of the cocaine found during Barnes' detention by the GPD officers, the court should also have suppressed the revolver as "fruit" of the cocaine under *Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407,

---

trial court, Barnes, after an explicit inquiry from the trial court, waived any conflict of interest arising from the fact that defense counsel's law partner was a former Assistant United States Attorney who had prosecuted Barnes in one of the cases serving as the basis for the counts charging possession of a firearm by a convicted felon. *See supra* note 4. Before obtaining Barnes' waiver, the trial judge informed defense counsel, in the presence of the defendant, that he would be removed as counsel of record if Barnes objected to his continued representation based on this information. Although waiver as to one possible conflict does not constitute waiver as to another, especially in situations where it is unclear that the defendant was aware of both conflicts at the time of the initial waiver, this inquiry put Barnes on notice that defense counsel could be dismissed as his attorney of record based on conflict of interest grounds. Given Barnes' propensity for directly addressing the district judge throughout the course of the trial, we are of the opinion that Barnes, if he had questioned his attorney's per-

formance at trial due to the alleged conflict of interest, would not have hesitated to alert the trial court of such dissatisfaction at some point during the trial. Thus, we are convinced that Barnes' unusually quiet demeanor regarding the "contract" information is significant because he was anything but shy in voicing his displeasure with other aspects of the proceedings.

9. In light of the possible consequences of a death threat, it is ludicrous to suggest that the government should not have communicated the "hit" information to defense counsel. Although certain governmental interferences with an attorney's representation of a criminal defendant may constitute a violation of the sixth amendment, *see Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984), we are of the opinion that the government's actions in this case were entirely proper. Barnes has presented no evidence of bad faith on the part of the government in informing defense counsel of the possible "contract" out on his life.

415–16, 9 L.Ed.2d 441 (1963), in which the Supreme Court stated that "[t]he exclusionary rule has traditionally barred from trial physical, tangible materials obtained during or as a direct result of an unlawful invasion."

We have recently summarized our standard for reviewing a district court's denial of a motion to suppress evidence:

"A district court's denial of a motion to suppress evidence will be affirmed on appeal unless it is clearly erroneous. We will rely on the district court's findings of fact absent a showing of clear error. This standard applies to the district court's findings on the credibility of witnesses, findings that will not be reversed unless clearly erroneous. 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L.Ed. 746 (1948). 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)."

*United States v. D'Antoni*, 856 F.2d 975, 978–79 (7th Cir.1988) (citations omitted).

As noted above, the trial court suppressed the cocaine found during the December 24, 1987, traffic stop because the government failed to establish that the GPD officers seized the shower cap containing the cocaine during their lawful "pat down" searches of Barnes or a search incident to Barnes' arrest. The court found that "[t]he facts established by the government at the suppression hearing support the inference that the cocaine fell from the sky just as strongly as one that it was seized from Barnes." The court also noted

that the most reasonable possibility regarding the seizure of the cocaine was "that the shower cap was found sometime before Snodgrass began frisking Barnes, perhaps even before Snodgrass stopped Barnes for the traffic violation." Barnes argues that in light of the trial court's finding that the cocaine was probably discovered prior to Snodgrass' "pat down" of Barnes, the revolver, discovered during Zacek's later "pat down" search, is "fruit" of the illegally seized cocaine and, thus, should have been suppressed. We disagree.

■ In denying Barnes' motion to suppress the Charter Arms Revolver, the trial court specifically found that the revolver was seized during Officer Zacek's lawful "pat down" search of Barnes. The likelihood that the cocaine was discovered prior to both Zacek's and Snodgrass' "pat down" searches is irrelevant to the legality of the seizure of the revolver unless the discovery of the cocaine was the impetus for the "pat down" searches. This clearly is not the case. It is undisputed that Officer Snodgrass' stopping of Barnes' vehicle due to the altered temporary license plate was proper and that his search of Barnes was justified by his observation of the "heavy object" protruding from Barnes' jacket pocket, as well as Barnes' attempt to reach for his pocket during the initial "pat down." *Cf. Sherrod v. Berry*, 856 F.2d 802, 805–07 (7th Cir.1988) (*en banc*). Snodgrass' observations, once communicated to Officer Zacek when he arrived on the scene, justified Zacek's completion of the "pat down" search for weapons.[10] Barnes does not contend that the discovery of the cocaine and the "pat down" searches are in any way related. The mere fact that the government failed to establish that one item of evidence was not seized pursuant to the lawful "pat down" search or a search incident to Barnes' arrest does not render

---

10. As noted above, Snodgrass did not deem it advisable to complete the initial "pat down" search without the assistance of other officers because Barnes "raised up" and reached for his pocket, prompting Snodgrass to place Barnes on the squad car and hold him at gunpoint until the other GPD officers arrived in response to his call for assistance. In view of the "inordinate

risk" confronting law enforcement officers in approaching and apprehending persons seated in automobiles, *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977), we are convinced that Snodgrass' actions in dealing with Barnes and the other members of the car were proper. *See Sherrod v. Berry*, 856 F.2d at 807 n. 2.

inadmissible other evidence, which was independently discovered during the course of the lawful searches. Thus, we reject Barnes' contention that the revolver was the "fruit" of the cocaine and hold that the trial court properly denied Barnes' motion to suppress the Charter Arms Revolver.

## V.

■ Barnes challenges the search warrant issued for the July 15, 1988, search of his home in Gary, Indiana, on two grounds: (1) that it is unsupported by probable cause; and (2) that it lacks a sufficiently particular description of the premises to be searched. At the outset, we note that Barnes has waived his particularity of description argument because he failed to challenge this aspect of the warrant in the trial court.[11] Thus, we will limit our discussion to the question of whether the warrant was supported by probable cause.

■ In reviewing a magistrate's issuance of a warrant based on his determination that an affidavit in support of the warrant establishes probable cause to search for evidence of criminal activity, this court will uphold the probable cause determination "so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing...." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)); *United States v. Griffin*, 827 F.2d 1108, 1111 (7th Cir.1987). Moreover, the Supreme Court has stated that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331. Rather,

"A magistrate's determination of probable cause is to be 'given considerable weight and should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated.' "

*United States v. Pritchard*, 745 F.2d 1112, 1120 (7th Cir.1984) (quoting *United States v. Rambis*, 686 F.2d 620, 622 (7th Cir. 1982)).

■ The affidavit upon which the magistrate premised his determination of probable cause was filed by FBI Agent Mark Becker. In the affidavit Agent Becker stated that he had obtained information regarding the defendant Barnes from two individuals to whom he referred as "Source No. 1" and "Lonnie." The affidavit stated that Source No. 1 had provided accurate information to Agent Becker in the past; Lonnie, however, had no history of providing information to the FBI. According to the affidavit, Lonnie informed Source No. 1 that he purchased cocaine from Barnes at his (Barnes') home in Gary on July 3, 1988. The following day, Source No. 1 accompanied Lonnie to Barnes' house and negotiated for the purchase of cocaine. Lonnie

---

**11.** In any event, we are of the opinion that the search warrant was sufficiently particular to identify the premises to be searched. Indeed, the search warrant described Barnes' house as follows:

"2679 Fillmore Street, Gary, Indiana, a one-story structure with white wooden-type siding and light green colored trim around the windows. The structure has white and green-colored shingles and a light grey-colored door which faces west, towards Fillmore Street. The structure is approximately 30 feet wide by 50 deep and there exists an addition on the south side, approximately 10 X 10 feet which has white colored wooden type siding. The front of the residence faces west and has three windows on the north end of the front,

a door entry in the middle of the front, and one window on the south end of the front side. There exists a wooden telephone pole with a large silver colored light located in the residence's lot, which is located between the residence and Fillmore Street. The structure has a television antenna and a weather vane on its roof. Proceeding south on Fillmore from 26th Street, the residence is the last house on the left bordered by a field to its south."

This description was sufficient to support the officers' search of Barnes' house, as well as other structures on Barnes' property. *See United States v. Griffin*, 827 F.2d 1108, 1113–15 (7th Cir.1987).

informed Source No. 1 that he had purchased a quantity of cocaine from Barnes on July 4, 1988, and sold a portion thereof to one Chris Ford. On the afternoon of July 4, 1988, Source No. 1 observed Chris Ford in possession of cocaine. The affidavit also stated that, on July 15, 1988, Lonnie, accompanied by two FBI agents, went to Barnes' house to discuss another cocaine purchase; however, the affidavit fails to state whether this transaction was ever consummated.

Viewing the affidavit under the "totality of the circumstances," as required by *Gates*, 462 U.S. at 234, 103 S.Ct. at 2330, we conclude that the magistrate properly determined that probable cause existed, justifying the issuance of the warrant. Barnes' primary attack on the affidavit is that the government failed to establish the credibility of Lonnie's statements. We disagree. Source No. 1 corroborated Lonnie's statement that he had purchased cocaine from Barnes by negotiating with Barnes for another purchase, as well as having the opportunity to observe Chris Ford with the cocaine that Lonnie had purchased from Barnes. The corroboration of a portion of Lonnie's statement lent credence to the other information he provided to Source No. 1, whose credibility is undisputed. *United States v. Spach*, 518 F.2d 866, 871 (7th Cir.1975). Moreover, Lonnie's statement that he purchased cocaine from Barnes and then sold some of it to Chris Ford is an admissible statement against Lonnie's penal interest, thus providing further support for Lonnie's credibility. *Id.* at 870 (citing *United States v. Harris*, 403 U.S. 573, 587, 91 S.Ct. 2075, 2084, 29 L.Ed.2d 723 (1971)). We are convinced that these facts established the credibility of the government informants and provided the magistrate with a solid basis for determining that "there [was] a fair probability that contraband or evidence of a crime [would]

be found in [Barnes' home]." *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. We therefore reject Barnes' challenge to the sufficiency of Agent Becker's affidavit and hold that probable cause supports the magistrate's issuance of the warrant to search Barnes' home.

## VI.

Barnes argues that the trial court erred in admitting in evidence a spiral notebook containing records of drug transactions and customer lists discovered during the July 15, 1988, search of his home. We note that Barnes carries a heavy burden in challenging the trial court's admission of evidence because " 'a reviewing court gives special deference to the evidentiary rulings of the trial court.' " *United States v. Shukitis*, 877 F.2d 1322, 1327 (7th Cir.1989) (citation omitted). "Thus, we will reverse such rulings only upon a showing that the trial court committed an abuse of discretion." *United States v. Briscoe*, 896 F.2d 1476, 1490 (7th Cir.1990).

■ Barnes contends that the admission of the notebook was error because the search warrant issued by the magistrate permitted the agents to search only for "cocaine, a Schedule II Narcotic Drug," not instrumentalities of the crime of cocaine distribution such as sales records and customer lists. Although the search warrant is limited to cocaine,[12] it is beyond dispute that cocaine is commonly distributed as a powder in small vials and envelopes and, thus, is easily concealable in confined areas, such as notebooks, hollowed-out books and human body cavities. *See United States v. Bennett*, 409 F.2d 888, 895 (2nd Cir.1969). In their search for cocaine, the agents were authorized to search any and all areas and items where the narcotic might readily be concealed. *See United States v. Griffin*, 827 F.2d at 1115. We

---

**12.** We are troubled by FBI Agent Gary Dunn's statements that during the search, he and the other agents conducting the search looked for "[P]ossible fruits of the crime, things of that nature." If the agents intended at the outset to search for such items, a warrant particularly describing such items was required. *See Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013,

1017, 94 L.Ed.2d 72 (1984). However, given our determination, *infra*, that the agents were entitled to look in the notebook for cocaine, which was clearly set forth in the warrant, we need not address Barnes' contention that the FBI agents' search of the notebook was part of a general exploratory search of Barnes' home in violation of the fourth amendment.

therefore hold that the agents' examination of the spiral notebook to ascertain whether some form of cocaine was concealed therein was proper. *See DiGuiseppe v. Ward,* 514 F.Supp. 503, 505 (S.D.N.Y.1981). The issue thus becomes whether the agents, after finding no cocaine hidden in the notebook, were entitled to seize this item without first obtaining a warrant to do so.

The "plain view" doctrine permits the warrantless seizure of evidence in a law enforcement officer's "plain view" when (1) the officer seizing the evidence "did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," (2) the incriminating nature of the evidence is "immediately apparent," and (3) the officer has "a lawful right of access to the object itself." *Horton v. California,* — U.S. ——, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990).[13] We have previously held that the FBI agents were in Barnes' home pursuant to a lawful search warrant, *see supra* section V, and that the warrant authorized the agents to search the premises for cocaine wherever it might be concealed, including the spiral notebook. Thus, the only remaining question under the "plain view" doctrine is whether the incriminating nature of the notebook was "immediately apparent." The spiral notebook contained calculations as to grams and ounces, as well as lists of individuals with notations as to "paid" and "owe" with accompanying numbers written after their names. In leafing through the notebook in their search for cocaine, it was inevitable that the agents would come upon these notations, most of which were in relatively large handwriting. Given the agents' statements and knowledge that they were searching for cocaine, we are convinced that the incriminating nature of these notations was immediately apparent. Thus, we

hold that the FBI agents were authorized to seize the notebook under the "plain view" doctrine and that the trial court's admission of this evidence was not an abuse of discretion.

## VII.

Barnes' next contention is that the trial court erred in failing to remove jurors Herron and Madison from the jury because of an alleged bias against Barnes based on the vandalism of Herron's van. As noted above, the trial court, after conducting *voir dire* examinations of the two jurors regarding the vandalism,[14] determined that they could remain fair and impartial and allowed them, without objection, to remain on the jury. Although Barnes acknowledges that his attorney failed to object to the jurors' continued service, he argues that the vandalism obviously biased jurors Herron and Madison such that the trial court's failure to remove them *sua sponte* is plain error because it deprived him of a fair trial.

"Due process requires that an accused be tried by an impartial jury free from outside influences." *United States v. Bates,* 852 F.2d 212, 219 (7th Cir.1988) (citing *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966)). However, due process does not require removal in every instance in which a juror might have been placed in a potentially compromising situation. *See Rushen v. Spain,* 464 U.S. 114, 118, 104 S.Ct. 453, 455, 78 L.Ed.2d 267 (1983) (per curiam). "Due process requires only that the trial court hold a hearing to determine if the potentially compromising situation has affected the jury's ability to deliberate fairly and has thus *actually* prejudiced the defendant." *Willard v. Pearson,* 823 F.2d 1141, 1148 (7th Cir.1987) (emphasis added). In reviewing the trial court's refusal to remove jurors based on allegations of bias,

---

13. *Horton* holds that the discovery of evidence in "plain view" need not be inadvertent, as a plurality of the Supreme Court had previously held in *Coolidge v. New Hampshire,* 403 U.S. 443, 469, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971). *See also United States v. Schire,* 586 F.2d 15, 17 (7th Cir.1978). Thus, we need not address Barnes' claims that the agents' discovery of the notebook was inadvertent.

14. As noted above, the trial court's special *voir dire* examination of jurors Herron and Madison took place out of the presence of the other members of the jury, but in the presence of the defendant, defense counsel and the prosecuting attorney. *See supra* note 7.

we accord great deference to the judgment of the experienced trial judge based on his unique opportunity to assess the credibility of the jurors during *voir dire* examination, as well as their demeanor throughout the course of the trial. *See United States v. Coven*, 662 F.2d 162, 175 (2d Cir.1981).

The trial court conducted a thorough and proper examination of jurors Herron and Madison, out of the presence of the other jurors, concerning the vandalism of Herron's van. After ascertaining the details of the incident, the court specifically inquired of the jurors, through questioning each one individually, if they could "set aside" their knowledge of the vandalism and remain fair and impartial in their consideration of the evidence, and both assured the court that they could. Barnes, in arguing that further examination of the jurors was required, did not suggest what other questions the trial court should have asked that would have uncovered the alleged bias of these jurors. *See United States v. Robinson*, 832 F.2d 366, 368 (7th Cir.1987). Barnes' contention, essentially, is that, because juror Herron's statement that she told juror Madison only that she had experienced "car trouble" conflicts with Madison's statement that he gave Herron a ride because "someone tried to steal her van last night, and she had to make out ... a police report," the jurors' statements that they could remain fair and impartial are not to be believed. We decline Barnes' invitation to reconsider the credibility of the two jurors because, as noted above, the trial court was in the best position to make such an assessment. The trial judge was not required to discredit the two jurors merely because there were minor inconsistencies in their testimony. *See United States v. Guzzino*, 810 F.2d 687, 695 (7th Cir.1987). In any event, we agree with the government that the disparity in the statements of the two jurors "establishes nothing more sinister than a faulty recollection by Juror Herron as to what she told Juror Madison. The real issue [is] not what Juror Madison was told, but whether the jurors could be impartial." Barnes has presented nothing to cast doubt upon the trial court's determination that jurors Herron and Madison could remain impartial, nor has he established that he suffered actual prejudice as a result of the vandalism of the van. Thus, we hold that Barnes' claim that he was deprived of a fair trial because jurors Herron and Madison were permitted to remain on the jury is likewise without merit.

### VIII.

Barnes' final contention on appeal is that the district court failed to conduct a hearing on his motion for recusal of Judge Moody. As noted above, Barnes, on the first day of trial, submitted three self-serving, unsupported letters relating his belief that Judge Moody was prejudiced against him and requested that he recuse himself from Barnes' trial.[15]

28 U.S.C. § 144 requires that, upon submission of a "timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against [the movant] or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding." Section 144 motions are timely if they are filed "at the earliest moment after [the movant acquires] knowledge of the facts demonstrating the basis for such disqualification." *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir.1976). As to the sufficiency of the affidavit,

"[t]he law is clear that in passing on the legal sufficiency of the affidavit, the judge must assume that the factual averments it contains are true, even if he knows them to be false.[ ] *E.g., United States v. Jeffers*, 532 F.2d 1101, 1112 (7th Cir.1976), *aff'd in part and vacated in part*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). An affidavit is sufficient if it avers facts that, if true, would convince a reasonable person that bias exists. *United States v. Baskes*, 687 F.2d 165, 170 (7th Cir.1981) (per curiam). The factual averments must give fair support to the charge of a bent of mind

---

**15.** We note that it was the defendant Barnes, not defense counsel, who submitted these letters to the court. Although this occurred in the presence of defense counsel, he presented no argument for recusal on behalf of his client.

**1072**

that may prevent or impede impartiality of judgment. *Berger v. United States,* 255 U.S. 22, 33–34, 41 S.Ct. 230, 233, 65 L.Ed. 481 (1921). They must not, however, be mere conclusions, opinions, or rumors. *United States v. Haldeman,* 559 F.2d 31, 134 (D.C. Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). They must be stated with particularity, *id.* [559 F.2d] at 131, and must be definite as to times, places, persons, and circumstances. *Id.* at 134. The factual averments must show that the bias is personal rather than judicial, *United States v. Patrick,* 542 F.2d 381, 390 (7th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977), and that it stems from an extrajudicial source-some source other than what the judge has learned through participation in the case. *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966)."

*United States v. Balistrieri,* 779 F.2d 1191, 1199 (7th Cir.1985) (footnote omitted). Moreover, the affidavit must "be accompanied by a certificate of counsel of record stating that it is made in good faith." 28 U.S.C. § 144.

■■■ Judge Moody's refusal to hold a hearing on the recusal motion was based on his determination that Barnes had failed to comply with both the procedural and substantive requirements of section 144. Specifically, the trial court noted: (1) Barnes' failure to present his letters relating the alleged bias until the morning of trial; (2) his failure to file both an affidavit and a certificate of good faith from his attorney; and (3) the letters' allegations of bias based entirely on previous proceedings over which Judge Moody had presided. Our review of the record convinces us that Judge Moody's rulings were proper. Even if we construe Barnes' letters as the affidavit required under section 144, the sub-

stance of the letters is insufficient to require a hearing on the recusal motion. All of Barnes' allegations of bias are based on previous civil and criminal actions over which Judge Moody had presided. Allegations of bias stemming from present and past cases in which the judge and the moving party were involved are not proper grounds for recusal. *See Jeffers,* 532 F.2d at 1112 (7th Cir.1976) (unless the facts presented allege a "personal" as opposed to a "judicial" bias, recusal is not required).[16] Barnes' attorney was no doubt aware of the "personal" bias requirement in refusing to present a certificate of good faith in conjunction with the letters, another requirement of section 144 with which Barnes failed to comply. Finally, despite Barnes' awareness that Judge Moody would be presiding over his trial from the date of his arraignment, July 27, 1988, Barnes, for some unknown reason, did not submit his letters to the trial court until the very morning of trial, January 23, 1989. Waiting almost five months to allege bias on Judge Moody's part falls far short of "rais[ing] the disqualification of the judge at the earliest moment after [the movant acquired] knowledge of the facts demonstrating the basis for such disqualification." *Patrick,* 542 F.2d at 390.[17] Given Barnes' failure to comply with the procedural and substantive requirements of 28 U.S.C. § 144, we hold that the trial judge's refusal to hold a hearing on this frivolous motion was proper.

### IX.

We reject Barnes' challenges to the rulings of the district court. Barnes' conviction and sentence are

A<small>FFIRMED</small>.

---

**16.** On appeal, Barnes attempts to submit the affidavit of another individual alleging that Judge Moody was biased against Barnes based, in part, on pretrial publicity regarding a prior judicial proceeding. However, under section 144, Barnes may file only one affidavit in a case, and we construe Barnes' letters requesting recusal as the section 144 affidavit in this case. Thus, we need not consider the allegations in

the proposed second affidavit in considering whether the trial court properly refused to conduct a hearing on the motion for recusal.

**17.** Barnes has made no argument on appeal that there was good cause for his untimely filing of the letters. *See* 28 U.S.C. § 144.