**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Orlando WILLIAMS, Defendant–**
**Appellant.**

**No. 97–2673.**

United States Court of Appeals,
Seventh Circuit.

Submitted Dec. 1, 1997.[1]

Decided Feb. 20, 1998.

---

1. Oral arguments were scheduled to be heard in this case on December 1, 1997. On November 25, 1997, however, we granted a motion that they be waived. The appeal, therefore, was submitted on the briefs and record.

Michelle A. Leslie (submitted), Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Gerald P. Boyle (submitted), Milwaukee, WI, for Defendant–Appellant.

Before EASTERBROOK, MANION, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Milwaukee police officers found one heck of a mess when they arrived at a home on North 53rd Street in their city during the early evening hours of October 22, 1996. The police had been dispatched to the area in response to a report of gunfire at the home, which turned out to be the residence of Laura Collins, a woman romantically "involved" with a couple of drug dealers, one in prison and one on the loose. When the police arrived they found cocaine all over the place. They found 5 kilograms inside the home, 6 more kilograms, packaged in the same fashion as the stash in the house, in the front yard, and additional kilos scattered in the general vicinity of the house. A grand total of 40 kilograms was recovered. They also found $2,220 in cash scattered in the front yard, $174 in a plastic bag inside the house, and an additional $10,600 in cash that was bundled and secured by rubber bands. The latter sum was found outside the house in a nearby gangway.

In addition to an obvious ransacking of the residence, police also noted several spent shells and, although it's not fully developed in the record, they also found a chap named Frank McRae nearby, who was shot up and bloodied. McRae died fairly soon after he was located by the police. So all in all the police had almost a million dollars worth of cocaine, a lot of cash, and a dead body, but just what happened was a mystery. The mystery was at least partially cleared up when Ms. Collins surrendered to the police a week later and gave a statement which led to two other statements.

We need not spend much time on the details of Collins' statement to the police. In substance, she admitted that substantial amounts of cocaine for dealing were in the house, that shots rang out, and that she and another man fled, believing the police were raiding the place. While they were fleeing, her companion got a bright, and apparently right, idea. He said it was not the police but that they were being "jacked," meaning robbed of their drugs and money. The most pertinent part of Collins' statement, as far as this case is concerned, is that she knew Orlando Williams as a friend of her incarcerated, drug-dealing former companion, Carl McAffee. A short time before the raid on October 22, Collins said she told Williams that she could get him a kilo of cocaine for $22,500. She said Williams agreed to make the purchase and left her home to get the money. When Williams returned, less than half an hour before the shooting, Collins said she placed a kilogram of cocaine under her shirt and went outside to meet Williams at his car. At the car, Williams gave Collins three or four bundles of money held together by rubber bands. Collins then returned to the house and Williams departed with the dope in his car. A few minutes later all hell broke out as the house was raided. All of this information, and some other evidence not relevant here, led to possession of cocaine with intent to distribute charges against Collins, Williams, and others. Collins eventually pled guilty to the charge against her and testified as the government's primary witness in its case against Williams. A jury found Williams guilty and the district court sentenced him to a term of 95 months in prison. We now consider his appeal, which challenges the sufficiency of the evidence presented against him and two trial errors—an alleged violation of a sequestration order and a claimed conflict of interest between the government prosecutor and the lawyer for Ms. Collins.

The sufficiency of the evidence argument borders on the frivolous. It is essentially a rehash of the sort of argument one would make to a jury—that Collins' claim that Williams came to her home on the evening of October 22 and bought a kilo of cocaine is not to be believed. Instead, the jury apparently should have credited Williams' testimony that he came to the house only to buy, or to pick up, one of

McAffee's suits for resale and that he didn't buy cocaine while he was there.

■ An appellate court, of course, is not the proper venue for resolving credibility disputes, and that is all that is presented here. But even in addition to the credibility concerns, there were bits and pieces of other evidence that the jury could easily credit in concluding that Williams was guilty. Not the least of the evidence is the fact that Williams' own testimony fairly reeks of implausibility, particularly his claims that he learned of the shooting of McRae from the street when it was reported to him by several unknown youths. The jury here, without question, had enough evidence placed before it to conclude that Williams possessed cocaine with intent to distribute it on October 22.

■ Next, Williams argues that his motion for a mistrial should have been granted after he pointed out to the court that a sequestration order had been violated. There's one teensy, weensy problem with this argument—no sequestration order was ever entered.

It's true that before opening statements the prosecutor, AUSA Pamela Pepper, said, "Judge, I've asked Ms. Boyle [Williams' counsel, Bridget Boyle] and we've talked about it, and both of our sets of witnesses will be sequestered." Judge Clevert replied, "Very good." There was no formal request for the entry of an order of sequestration pursuant to Rule 615 of the Federal Rules of Evidence, nor does the record reflect that the judge ever entered a sequestration order on his own after being advised of this apparent stipulation.

The government's case against Williams consisted of the testimony of several police officers, Ms. Collins, McAffee, Maurice Bohannon (Frank McRae's brother, who testified that he learned Frank was shot when Williams called him and told him so), and an FBI agent who testified about telephone records documenting various calls, including calls to and from the Collins home on October 22. The question regarding witness sequestration arose during the cross-examination of McAffee when he said he had a telephone conversation the previous evening with Collins, who had testified the previous day, and again the morning before McAffee took the stand. When questioned about whether they discussed the case, McAffee said they talked a little, but did not have a "whole lot of discussion." He acknowledged that Collins had said she had been cross-examined by the defense attorney and "mentioned a little something about the case." McAffee asserted that he simply told Collins to be strong. He also said that neither of them told the other what to say in the courtroom. Upon getting the news of this conversation, Williams alleged a violation of "the sequestration order" and moved for a mistrial or, in the alternative, to have McAffee's testimony stricken.

Judge Clevert conducted a hearing out of the presence of the jury on the motion and eventually concluded that no formal sequestration order (under Rule 615 of the Federal Rules of Evidence) had been entered in the first instance and, further, that Collins and McAffee were not specifically advised that they should not confer with one another or discuss the events in the courtroom during the course of the trial. The judge also found that although Collins and McAffee had contact following Collins' testimony and that although the contact was contrary to the spirit of the "sequestration stipulation" between the parties, it did not appear that the conversation (actually there were two, but we can skip that detail) between Collins and McAffee was prejudicial to the defense.

Rule 615 of the Federal Rules of Evidence states:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.

Rule 615, of course, is designed to thwart witnesses from fashioning their testimony to that which has already been given and to help in detecting testimony that is less than truthful. *See United States v. Gammon,* 961 F.2d 103 (7th Cir.1992). The rule codified a well-established common law tradition of sequestering witnesses "as a means of discouraging and exposing fabrication, inaccuracy, and collusion." *See United States v. Jack-*

*son,* 60 F.3d 128, 133 (2d Cir.1995) (quoting Fed.R.Evid. 615 advisory committee's notes).

■ It is not at all uncommon for trial attorneys to treat sequestration orders under Rule 615 in a nonchalant manner, but a cavalier approach is not advisable. Although sequestration requests are routinely made in cases where they are unnecessary, in cases where they are necessary, or at least advisable, attorneys should specifically note the rule and ask the trial judge to formally invoke it. Without taking these minimal steps, it will be the rare case indeed where we could conclude that a "sequestration order" has been violated. Those minimal steps were not taken here, so we need not consider whether Judge Clevert abused his discretion, a rather deferential standard of review, in denying the motion for a mistrial. But we hasten to add that the hearing conducted by Judge Clevert demonstrated that this was clearly a no harm no foul situation. The testimony of McAffee and Collins did not overlap. She described her negotiations with Williams and the eventual sale of cocaine to him, while McAffee, on the other hand, had no firsthand knowledge of the events of the night in question. His testimony concerned his prior relationship with Williams, his knowledge of Williams as a drug trafficker, and his conversation with Williams several days after the shoot-out on 53rd Street. So we move to the final issue, Williams' contention that he is entitled to a new trial because of a "conflict of interest" involving AUSA Pepper and Laura Collins' attorney, Robin Shellow.

■ We are befuddled by Williams' "conflict of interest" argument. Williams' trial wrapped up on February 6, 1997. A few days later, Pepper and Shellow had a discussion involving Pepper's moving from the United States Attorney's office to work as an attorney in Shellow's firm. The two entered into an employment contract sometime in March of 1997. Pepper left the United States Attorney's office on March 21 and joined Ms. Shellow's firm on April 7.

What does this all have to do with Mr. Williams? one might ask. We ask the same thing. Citing one case for the inapplicable proposition that "a criminal defendant is enti-

tled to counsel whose undivided loyalties lie with the client," *United States v. Barnes,* 909 F.2d 1059, 1065 (7th Cir.1990), Williams argues that Pepper "should have notified him immediately of the conflict of interest." We fail to see how Pepper's post-trial discussions with Shellow in any way created a "conflict of interest" for Williams or how they in any way prejudiced his rights. Williams had an attorney who defended him without a conflict of interest. The entire record demonstrates that Pepper and Shellow handled their employment discussions in a professional and ethical manner. To somehow turn Williams into a third-party beneficiary of their employment contract on some muddled "conflict of interest" theory is unavailing. The judgment of the district court is

AFFIRMED.