UNITED STATES of America,
Plaintiff,

v.

John WICK, Defendant.

No. CR 98–663 MV.

United States District Court,
D. New Mexico.

Feb. 11, 1999.

Tara Neda, Assistant U.S. Attorney, Albuquerque, NM, for Plaintiff.

Susan Dunleavy, Assistant Public Defender, Albuquerque, NM, for Defendant.

### MEMORANDUM OPINION AND ORDER

VAZQUEZ, District Judge.

**THIS MATTER** is before the Court on Defendant's Motion to Suppress [**Doc. No. 12**]. The Court held an evidentiary hearing on the Motion on January 13, 1999. Having considered the moving papers, relevant law, evidence presented at the hearing, and otherwise being fully informed, the Court finds that the Motion is well taken and will be **GRANTED IN PART**

and **DENIED IN PART**, as explained below.

## BACKGROUND

Defendant John Wick is charged by indictment with knowingly possessing parts designed and intended for use in converting a firearm into a fully automatic machine gun, in violation of 26 U.S.C. § 5845(b).

In the spring of 1998, Wick was serving in the U.S. Air Force, stationed at Canon Air Force Base in New Mexico. In March, employees at the Base post office noticed that Wick had received two UPS packages marked "ammunition" and two packages which "smelled like fertilizer." Agents with the Air Force Office of Special Investigation (OSI) determined that Wick did not have any weapons or ammunition stored at the Base armory. Air Force regulations prohibit service members from keeping guns or ammunition in their on-base homes and require that all personally owned guns or ammunition be stored in the Base armory. Wick lived on-base in a dormitory style room.

Based on the forgoing, a military magistrate approved of an "Authority to Search and Seize" form, the military equivalent of a search warrant, permitting OSI agents to search Wick's room. The warrant granted authority to search for and seize "ammunition and ammunition components" only.

On April 15, 1998, three OSI officers, Special Agent Michael Youngs, Special Agent Shilaikis, and Special Agent Carow, conducted the search of Wick's room. The search commenced at approximately 3:20 pm and concluded at approximately 5:30 pm. Wick was present in the room during the entire search. Later that evening, the agents returned to Wick's room a second time after they discovered that they failed to seize five rounds of ammunition which they discovered during their search. Wick allowed them back into his room in order to retrieve the ammunition.

In addition to the five rounds of ammunition, the OSI agents seized numerous items not listed in the search warrant. Specifically, the complete search inventory lists the following items:

1. Two issues of Shotgun News.
2. Six videocassettes from American Gunsmithing Institute as follows:
 a. MAKAROV Armorer's Course Maintenance and Technical Manual
 b. H & K Armorer's Course Maintenance and Technical Manual
 c. Browning Hi-power Armorer's Course Maintenance and Technical Manual
 d. AR15 Armorer's Course Maintenance and Technical Manual
 e. AKS and MAK90 Type Armorer's Course Maintenance and Technical Manual
 f. Colt–1911 .45 Auto, Armorer's Course Maintenance and Technical Manual
3. Two drilling fixtues as follows:
 a. One AR–15/M–16 Drilling Fixture with Instructions
 b. One AKS to AK–47 Drilling Fixture with Instructions
4. Four cloth hand gun cases with zipper.
5. Twenty-nine Gun Tests Buying Guide Magazines.
6. Four books as follows:
 a. Marine Sniper
 b. One Shot One Kill
 c. Hunters and Shooters
 d. Army Officers Guide
7. "Fifteen various magazines relating to books, Hunting & Military Gear, Weapons & Ammunition."
8. Three books as follows:
 a. Rune Magic
 b. Circle of Intrigue
 c. Revelations
9. Five videocassettes titled Cold Steele Proof, described at the evidentiary hearing as instructional videos on the use of knives.
10. Two books as follows:

a. Carl Von Clausewitz

b. Unconditional Freedom

11. Five order invoices for the following items:

a. Bolt carrier with gas piston and 19 piece repair kit

b. AKS fixture and blueprint for drop-in Auto Sear for AR–15

c. AK compensator and AK compensator AK 74 Type

d. AK compensator US slant and AK compensator AK 74 type

e. Armorer's Course Videos.

12. One blue-print and instructions for Drop-in-Auto Sears for AR–15's.

13. Five photocopies of map of Amarillo, TX, one with red markings at various locations "to include adjacent to The Civic Center and City Hall."

14. Lease contract for A–Key Storage, Clovis, NM.

15. Letter from A1C [Airman First Class] Draisen.

16. Flashpoint Newsletter and envelope, described as "about TEXE MARRS religious beliefs."

17. Seventeen photographs as follows:

a. Nine photos of individual firing "what appears to be an AK–47 assault rifle"

b. Six photos of open land

c. Two photos of ground

d. Four strips of negatives

18. Five AK–47 bullets (referred to above).

19. Two videocassettes as follows:

a. AKS to AK–47 Conversion

b. AR–15 to M–16 Conversion

20. "Sixty-one photographs and fourteen negatives," identified at the hearing on this Motion as an undeveloped roll of film.

Agent Youngs testified at the evidentiary hearing that the two drilling fixtures and the four video tapes on conversion of firearms were all seized as evidence that Wick was engaged in illegally converting firearms to fully automatic fire. Agent Youngs testified that most of the other unlisted items were seized because the agents became suspicious that Wick was "actively participating" in a hate group. Air Force service members are prohibited from "active participation" in supremacist and hate groups. Air Force Instruction 51–903, March 4, 1994, "Dissident and Protest Activities." Active participation is defined as "publicly demonstrating or rallying, fund raising, recruiting and training members, organizing or leading."*Id.* Passive membership in such groups is permitted.

After the agents completed the search of Wick's room, Agent Youngs contacted the Bureau of Alcohol, Tobacco and Firearms. Agent Youngs also contacted the A–Key Storage Facility and verified that the lease for storage unit F–9 was made to Wick and that the payments were current. ATF agents determined that the drilling fixtures and instructions seized from Wick's room were specifically manufactured to convert semi-automatic firearms into fully automatic machine guns. ATF agents then searched the National Firearms Registration and Transfer Record and determined that Wick did not own any registered firearms and was not listed as a manufacturer. Agent Youngs investigated a series of UPS packages sent to Wick and determined that he had received nine packages from firearms parts and accessory distributors between March 19, and April 14, 1998. Agent Youngs further determined that Wick accessed his storage locker at A–Key Storage on five occasions between March 19, and April 5, 1998, on or near dates when he received UPS packages.

Based on the foregoing, a U.S. Magistrate issued a search warrant for Wick's storage unit at A–Key Storage Facility. The search warrant authorized the agents to search for and seize the following items:

Any machineguns; any semi-automatic firearms which appear to be evidence of, or possessed with the intent to, convert to fully-automatic fire; diagrams, books, video tapes, or other media in whatever form, on how to convert semi-

automatic weapons for fully-automatic fire; parts (including but not limited to: triggers, hammers, sears, disconnectors, selector switches, bolts and receivers) associated with or manufactured for weapons capable of fully-automatic fire; tools, to include machine tools, which may be evidence of and associated with the conversion of semi-automatic fire-arms into machineguns; receipts for the purchase or sale of the above-listed items; and records in whatever form, that establish that the person or persons who have control, possession, custody or dominion over the property to be searched, or who have dominion and control over a particular area of the property to be searched, and from which evidence, if any, is seized, including but not limited to: personal mail; checkbooks, deposit slips, canceled checks, ATM receipts, etc.; personal identification; letters, notes or other correspondence; utility bills or statements; rent or other payment receipts; financial documents; keys; photographs (developed or undeveloped); leases, mortgages, or mortgages statements; vehicle registration information or ownership warranties or other related documents or literature; receipts for vehicle parts and repairs; gasoline or toll receipts; and telephone answering machine introductions.

The search of the storage locker revealed five semi-automatic rifles and the additional parts necessary to complete conversion of firearms to fully-automatic weapons. In addition, agents seized various items of evidence, the specifics of which are not here relevant, but which generally demonstrated that Wick had been using an alias.

Wick now moves for suppression of all of the evidence seized in both searches.

## ANALYSIS

Defendant Wick argues that all of the evidence seized during the search of his dormitory room must be suppressed because the search and seizure so exceeded the scope of the warrant that it deteriorated into a "general search," tainting the seizure of even the five bullets authorized by the warrant. Further, Wick asserts that because the warrant for the storage locker was based on this illegally seized evidence, all of the evidence seized in the second search must also be suppressed as fruit of the poisonous tree. The government responds that the seizure of items not listed in the warrant for Wick's room was permissible based on the plain view doctrine and that all of the evidence is therefore admissible.

The Court will first address whether blanket suppression is appropriate in this case. Concluding that it is not, the Court will next determine, item by item, whether the unlisted objects which were seized fall within the plain view exception to the warrant requirement. The Court finds that only the drilling fixtures, the video tapes on firearm conversion and the five video tapes on knife fighting were legally seized under the plain view doctrine. Having concluded that the rental agreement for the storage locker was improperly seized, the Court must also suppress all evidence seized in the search of the storage locker as fruit of the poisonous tree. Finally, the Court addresses whether the items found in the search of the storage locker are admissible under the inevitable discovery doctrine, an argument which the government failed to raise. The Court holds that because the record does not provide a solid evidentiary foundation for concluding that the items in the storage locker would inevitably have been found by law enforcement agents, the Court cannot *sua sponte* admit these items under the inevitable discovery doctrine.

### 1. Blanket Suppression

As a general rule, when law enforcement officers seize items beyond the scope of a search warrant, "only the improperly seized evidence, not all of the evidence, must be suppressed ...." *United States v. $149,442.43 in U.S. Currency,* 965 F.2d 868, 875 (10th Cir.1992) (quoting

*United States v. Medlin,* 798 F.2d 407, 411 (10th Cir.1986) (*Medlin I* )); *United States v. Abram,* 830 F.Supp. 551, 554 (D.Kan. 1993). However, if officers "deliberately and flagrantly" disregard the terms of the warrant, using it as a general grant of authority to search and seize whatever they like, blanket suppression of all items seized is appropriate, including those items listed in the search warrant or those which might have been admissible under the plain view doctrine. *United States v. Medlin,* 842 F.2d 1194, 1199–1200 (10th Cir. 1988) (*Medlin II* ); *United States v. Foster,* 100 F.3d 846, 850–51 (10th Cir.1996). In the seminal case of *Medlin II,* federal officers were executing a federal search warrant which authorized the search and seizure of only illegally possessed weapons and related materials. 842 F.2d at 1195–96. State law enforcement officers investigating a series of burglaries accompanied the federal officers and, with the assistance of the federal agents, seized 667 items which they believed to be stolen but which were beyond the scope of the warrant. *Id.* at 1196. Reviewing cases from other Circuits in which all evidence had been excluded as a consequence of a search beyond the scope of the warrant, the *Medlin II* court observed,

> [t]he basis of those decisions which hold that blanket exclusion is appropriate when a search warrant is executed with "flagrant disregard" for its terms is found in our traditional repugnance to "general searches" which were conducted in the colonies pursuant to writs of assistance. To protect against such invasive and arbitrary searches, the Fourth Amendment mandates that search warrants "particularly describ[e] the place to be searched and the persons or things to be seized." As the Supreme Court stated in *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231: "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to

what is to be taken, nothing is left to the discretion of the officer executing the warrant."

*Id.* at 1196. The court then held,

> [w]hen law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant.

*Id.*

Likewise, in *Foster, supra,* 100 F.3d 846, state law enforcement officers executed a warrant permitting the search and seizure of only marijuana and three specified firearms. *Id.* at 848. Drug Enforcement Officers were called to the scene and assisted in the search. The DEA agents seized 35 items, "including various firearms, ammunition, videotapes, marijuana, drug paraphernalia, and other miscellaneous items." *Id.* "For their part, the state officers seized anything of value in the house," including electronic equipment, lawn equipment, various tools, coins, and jewelry, *Id.* The district court, in suppressing everything seized in the search, stated that,

> [w]hile it is true that a limited number of items listed in the sheriff's return can be classified as contraband or other incriminating evidence inadvertently found during the execution of the warrant, it is abundantly clear from the testimony of Martin, as well as the testimony of Wilson and Cowart, that there was a wholesale seizure of Foster's property amounting to a fishing expedition for the discovery of incriminating evidence. In fact, upon cross-examination by defense counsel, Martin admitted that the officers "took anything of value" and that this was standard procedure in the execution of a Sequoyah County search warrant. Other than the readily observable firearms, marijuana, and assorted contraband . . . no attempt was made to substantiate a connection between the

seizure of the majority of the seized items and the terms of the warrant. As candidly admitted by Martin, the officers simply "took anything of value" and did not adhere to the specific terms of the warrant.

*Id.* at 850. The Tenth Circuit upheld the blanket suppression, stating that "it is abundantly clear that the officers' disregard for the terms of the warrant was a deliberate and flagrant action taken in an effort to uncover evidence of additional wrongdoing." *Id.* at 851. The court emphasized that "blanket suppression should only be imposed in the most 'extraordinary' of cases." *Id.* at 852.

Although neither *Medlin II* nor *Foster* specifically state that blanket suppression requires a showing of bad faith or improper motive on the part of the executing officers, both explicitly require something more than a mere failure of judgment. The *Medlin II* court condemned "flagrant disregard" for the terms of the warrant and law enforcement officers "grossly exceeding" the scope of the warrant. *Medlin II,* 842 F.2d at 1198–99. *Foster* arguably went even further, requiring "deliberate and flagrant" disregard for the terms of the warrant. *Foster,* 100 F.3d at 851. Moreover, the *Foster* majority specifically rejected the dissent's proposition that blanket suppression was appropriate only if bad faith had been shown both in obtaining and executing the warrant, concluding instead that *Medlin II* was concerned with only "the actual execution of the warrant rather than the mental state of the officers at the time they obtained the warrant." *Id.* "The evil that this circuit addressed in *Medlin [II]* . . . was the use of an otherwise valid warrant to conduct a general search." *Id.*

Moreover, other courts applying the holdings of *Medlin II* and *Foster* have specifically applied a good faith standard and evaluated the officers' motives in conducting the search. *See United States v. Hargus,* 128 F.3d 1358, 1363 (10th Cir. 1997) (considering the motivation of officers in seizing whole file cabinets rather than specific files named in the warrant); *$149,442.43 in U.S. Currency,* 965 F.2d at 875 (applying good faith standard); *Abram,* 830 F.Supp. at 556 ("The court can only conclude that the IRS agents conducting the search were motivated by sheer laziness, a desire to harass the [the defendants], or a desire to engage in a fishing expedition among the documents indiscriminately seized from the [defendants'] home. Any of these three motives cannot be condoned by the court and can only be characterized as flagrant disregard for the terms of the search warrant."); *United States v. Turley,* 830 F.Supp. 547, 549 (D.Kan.1993) (applying good faith standard); *United States v. Larson,* 1995 WL 716786 *7 (D.Kan.1995) ("*Medlin's* rule of excluding all evidence seized in a general search is designed to combat the very mindset displayed by [the officer in this case]. The belief that a search warrant gives an officer free rein to search and seize cannot be tolerated.").

■ Thus, blanket suppression is only appropriate when the officers "deliberately and flagrantly" disregard the terms of the warrant; in other words, when the officers, in bad faith, use the warrant as a general grant of authority to search and seize whatever they like. *See Hargus,* 128 F.3d at 1363. This places the Court in the position of having to distinguish between a search in which officers seized unnamed items as a result of a good faith but possibly erroneous belief that the items fall within the plain view doctrine and a search in which officers "flagrantly and deliberately" disregarded the terms of the warrant in order to conduct a "fishing expedition" for potential evidence.

■ In the present case, military officers conducting the search of Wick's room were entitled to search for and seize only "ammunition and ammunition components." Wick was suspected of no crime other than storing ammunition in his on-base room. In addition to the five rounds of ammunition found, the officers also seized 181 other items, including books,

magazines, newsletters, photographs, negatives, personal letters and other personal papers. Indeed, it is some what ironic that when the officers first left Wick's room they took with them "many bags" of material but forget to take the five rounds of ammunition, the only items which the warrant specifically allowed them to seize. It is particularly disturbing that much of the material seized is personal and political in nature, raising serious First Amendment concerns.

There is ample reason to believe that the officers lost sight of the limited reason they were permitted to enter Wick's room. At a minimum, the officers were operating with a serious misunderstanding as to what they were authorized to do in Wick's room and with a frighteningly broad vision of what amounted to incriminating evidence. Undoubtedly, the officers "grossly exceeded" the terms of the warrant.

Nevertheless, the Court concludes that the officers did not "deliberately and flagrantly" disregard the terms of the warrant. The Court concludes that the officers did not intentionally use the warrant as a ruse to search for other items nor did they simply seize everything of value in the room. Rather, Agent Youngs testified that the officers chose not to seize hunting knives because the knives were within Air Force regulations, even after finding videocassettes which apparently described knife fighting techniques. Evidence was also presented that the officers chose not to seize posters with Nazis insignia even though they found the posters indicative of Wick's involvement with something suspicious. Thus, the officers did attempt to use at least some discretion in seizing only those items which the officers concluded were indicative of possible wrongdoing. Although the Court concludes below that the officers incorrectly and illegally seized numerous items which do not fall within the plain view exception to the warrant requirement, the Court concludes that the officers were attempting in good faith to follow the law as they understood it. The fact that the officers did not comprehend the limited nature of the plain view exception demonstrates a lack of training but not a lack of good faith. Thus, because the officers did not "deliberately and flagrantly" disregard the terms of the warrant, blanket suppression of all of the evidence seized in both searches is not warranted. *Foster,* 100 F.3d at 851–52; *Hargus,* 128 F.3d at 1363.

### 2. The Plain View Exception

■ It remains the case, however, that the officers were permitted to seize only those unlisted items which fall within the plain view exception to the warrant requirement. As the Supreme Court recently reiterated,

> [u]nder that doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—i.e., if its incriminating character is not immediately apparent,—the plain-view doctrine cannot justify its seizure.

*Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (quotation marks and citations omitted); *see also Arizona v. Hicks,* 480 U.S. 321, 324–25, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Horton v. California,* 496 U.S. 128, 136–137, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

As the Supreme Court stated in *Dickerson,* "the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures." *Dickerson,* 508 U.S. at 376, 113 S.Ct. 2130. Thus, in *Dickerson,* the Court upheld the suppression of crack cocaine seized during a pat-down search because the officer testified that he did not immediately recognize that the item was contraband, but had to manipulate the item further to discover its identi-

ty. *Id.* at 378, 113 S.Ct. 2130. The court stated,

> [w]here, as here, an officer who is executing a valid search for one item seizes a different item, this Court rightly has been sensitive to the danger that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will.

*Id.* (quotation marks and citation omitted). "Here, the officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to the sole justification of the search under Terry .... It therefore amounted to the sort of evidentiary search that Terry expressly refused to authorize and that we have condemned in subsequent cases." *Id.* (citations and quotation marks omitted). Because the "the incriminating character of the object was not immediately apparent to" the officer but was only revealed after a further, unauthorized search, the evidence had to be suppressed. *Id.* at 379, 113 S.Ct. 2130.

Likewise, in the now classic case of *Arizona v. Hicks, supra*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347, the Supreme Court held that a stolen stereo was not admissible under the plain view doctrine where the officer, lawfully on the premises due to exigent circumstances, moved the stereo in order to view the serial number to determine if it was stolen. *Id.* at 324–35, 107 S.Ct. 1149. The court held that,

> the mere recording of the serial numbers did not constitute a seizure.... Officer Nelson's moving of the equipment, however, did constitute a "search" separate and apart from the search for the shooter, victims, and weapons that was the lawful objective of his entry into the apartment. Merely inspecting those parts of the turntable that came into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest. But taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry.

*Id.* (citations omitted).

■ Thus, the plain view doctrine, as articulated by the Supreme Court in *Arizona v. Hicks* and *Minnesota v. Dickerson,* places two important constraints on the searching officers conduct: (1) the officer may not conduct a more intrusive or extensive search of an item than is necessary to determine whether it falls within the scope of the officer's authority to search and seize; and (2) the officer may not seize anything beyond his or her granted authority whose incriminating character is not immediately apparent. *See United States v. Soussi,* 29 F.3d 565, 570 (10th Cir.1994). It must be remembered that the plain view doctrine is an exception to the Fourth Amendment's particularity requirement; the doctrine "may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Id.* (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)).

Special problems arise in cases such as this one in which the law enforcement officers inspect and seize personal papers. In this case, the officers were entitled to search for and seize ammunition and ammunition components. Under this grant of authority, were the officers entitled to read personal papers and books that they encountered during their search? As in *Dickerson,* the officers would have been immediately alerted to the fact that the papers were not ammunition and ammunition components. Were they entitled to inspect them further in order to determine whether they were incriminating? And what makes a document, book or photograph incriminating?

As to the scope of the permitted inspection, in cases pre-dating *Dickerson,* and most pre-dating *Hicks* as well, several

courts have held that officers may "briefly peruse" documents which they encounter during a search even when the terms of the search warrant explicitly exclude all documents per se. *See United States v. Tolerton,* 669 F.2d 652, 653–54 (10th Cir. 1982); *United States v. Gentry,* 642 F.2d 385, 387 (10th Cir.1981); *See United States v.. Barnes,* 909 F.2d 1059, 1070 (7th Cir. 1990); *United States v. Issacs,* 708 F.2d 1365, 1369 (9th Cir.1983); *United States v. Heldt,* 668 F.2d 1238, 1267 (D.C.Cir.1981) (per curium), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982); *United States v. Crouch,* 648 F.2d 932, 933 (4th Cir.1981); *United States v. Damitz,* 495 F.2d 50, 56 (1974). Thus, in *Tolerton. supra,* 669 F.2d 652, the Tenth Circuit upheld under the plain view doctrine the seizure of a pawn ticket found in a drawer while the officer was searching under a warrant that permitted the seizure of keys. *Id.* at 653–54. Because the officer knew that the potential murder weapon had been recently pawned, the Tenth Circuit found that the incriminating nature of the pawn ticket was immediately apparent, even without reading the document. *Id.* at 654.

In the Tenth Circuit case of *Gentry, supra,* 642 F.2d 385, the search warrant permitted the officers to search for drugs. In the course of this search, the officers opened a brief case and discovered papers describing the sale and manufacture of methamphetamine. *Id.* at 387. The court concluded that because "[i]t is logical and reasonable" that the drug might be contained in the brief case, the officers were entitled to inspect the contents of the case to determine if drugs were inside. *Id.* The court did not address whether the officers were entitled to read the documents in the case and, if they were, how closely. However, another Tenth Circuit case recently described *Gentry* as upholding "the plain view seizure of documents even when the police only learned of the documents' incriminating nature by *perusing* them during a lawful search for other objects." *Soussi,* 29 F.3d at 570 (emphasis added). In *Soussi,* the search warrant permitted

the officers to seize certain specified documents, thus necessarily requiring them to inspect all of the documents they encountered. The Tenth Circuit upheld the seizure of documents not named in the search warrant but cautioned that the courts must remain "mindful of the grave dangers to privacy interests" inherent in searches which encompass personal papers. *Id.* (quoting *Andresen v. Maryland,* 427 U.S. 463, 482, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976)).

As did the Tenth Circuit in *Gentry,* other circuits have permitted the brief inspection of books, papers and envelopes when the officers were searching for drugs that could have been hidden inside these items. *See Barnes,* 909 F.2d at 1070; *Crouch,* 648 F.2d at 933; *Damitz,* 495 F.2d at 56. As the Seventh Circuit stated in a typical case,

> [a]lthough the search warrant is limited to cocaine, it is beyond dispute that cocaine is commonly distributed as a powder in small vials and envelopes and, thus, is easily concealable in confined areas, such as notebooks, hollowed-out books and human body cavities. In their search for cocaine, the agents were authorized to search any and all areas and items where the narcotic might readily be concealed. We therefore hold that the agents' examination of the spiral notebook to ascertain whether some form of cocaine was concealed therein was proper.

*Barnes,* 909 F.2d at 1069–70. Each of these cases has emphasized, however, that the incriminating nature of the documents was apparent without extensive inspection. In *Crouch, supra,* 648 F.2d 932, for example, the Fourth Circuit stated that a "brief perusal," short of "reading," revealed the incriminatory nature of the letters seized. *Id.* at 933.

This Court has been able to locate only two cases discussing the permissible scope of the inspection of documents during a search under the precedents of *Hicks* and *Dickerson.* *See United States v. Rude,* 88

F.3d 1538, 1552 (9th Cir.1996); *United States v. Padilla,* 986 F.Supp. 163, 170–71 (S.D.N.Y.1997). In the Ninth Circuit case *Rude, supra,* 88 F.3d 1538, the search warrant permitted the officers to seize certain documents dated after May, 1992. The officers seized at least 18 documents which pre-dated the search warrant cutoff. *Id.* at 1552. In reviewing the defendant's contention that the officers were not permitted to inspect or seize these documents, the court observed,

> [j]ust as the officer in *Hicks* could not, absent probable cause, upon glancing at a stereo, move it and look for a serial number it may be argued that neither may an officer, upon glancing at a document noticeably beyond a search warrant, peruse it and look for incriminating evidence.

*Id.* The court continued, quoting from a D.C. Circuit case decided before *Hicks,*

> [t]he incriminating character limitation necessarily permits a brief perusal of documents in plain view in order to determine whether probable cause exists for their seizure under the warrant. If in the course of that perusal, their otherwise incriminating character becomes obvious, they may be seized. Otherwise, the perusal must cease at the point at which the warrant's inapplicability to each document is clear.

*Id.* (quoting *Heldt,* 668 F.2d at 1267). The Ninth Circuit noted that, "[t]his is not a case in which the officers merely perused the documents to determine whether they fell within the scope of the search as specified by the search warrant; their immediate observation of the contested documents revealed that the documents fell outside the warrant." *Id.* The court then assumed that the documents did not fall within the plain view doctrine but held that their admission at trial was harmless error. *Id.* at 1553.

On the other hand, the District Court for the Southern District of New York recently suppressed several documents which it concluded were not "incriminatory on their face." *Padilla,* 986 F.Supp. at 170–71. In *Padilla,* the defendant had consented to a search of her apartment for drugs and guns. Again, harkening back to *Hicks,* the court stated,

> [j]ust as officers may not, upon glancing at a stereo, move it to look for a serial number unless they have probable cause to believe it was stolen, neither may officers, upon glancing at documents noticeably beyond the scope of the consent, peruse them in search of incriminating evidence.

*Id.* at 170. The court observed that in cases such as *Soussi,* where the officers are permitted to search and seize some documents, a more thorough inspection of all documents is necessary. *Id.* "But," the court continued,

> in this case, the agents were only authorized to search for guns and drugs. All documents were beyond the scope of the lawful consent. [The searching officer] did not have license to cursorily peruse the documents to determine if they were incriminatory because all documents were beyond the scope of her lawful search.

*Id.* Accordingly, the court ordered suppressed all documents which were not "incriminatory on their face," including a phone bill, an address book, a spiral-bound notebook, business cards and assorted papers. *Id.* at 170–71. The court did permit the admission of two items which named a co-defendant and related to an address also under investigation as these documents linked the defendant to other individuals known by the officer to be involved in a conspiracy to distribute drugs. *Id.*

As to the kinds of documents which are "immediately" or "inherently incriminating," courts have found the following documents to be incriminatory on their face: papers related to the sale or manufacture of drugs (*Barnes,* 909 F.2d at 1070; *Crouch,* 648 F.2d at 933; *United States v. Pugh,* 566 F.2d 626, 627–28 (8th Cir.1977); *Damitz,* 495 F.2d at 56); loansharking ledger sheets (*United States v. Ochs,* 595 F.2d 1247, 1256 (2nd Cir.1979)); gambling

records (*United States v. Gargotto*, 476 F.2d 1009, 1013 (6th Cir.1973)); fake identification cards (*United States v. Maude*, 481 F.2d 1062, 1069 (C.A.D.C.1973)); documents which link the defendant to known co-defendants (*Padilla*, 986 F.Supp. at 171); and documents showing that the defendant lived in the house where illegal drugs were found (*United States v. Smith*, 462 F.2d 456, 461 (8th Cir.1972)).

On the other hand, in the recent Tenth Circuit case of *United States v. Robertson*, 21 F.3d 1030 (10th Cir.1994), the court of appeals upheld the suppression of traffic tickets and photos which it found were not inherently incriminatory. In *Robertson*, the officers entered a home pursuant to a search warrant permitting the seizure of the fruits and/or instrumentalities of a carjacking. *Id.* at 1035. Among several unlisted items, officers seized "a camel head container with ammunition inside," traffic tickets issued to an unknown individual, and photographs of the defendant and others displaying gang signs. *Id.* at 1032. The Tenth Circuit upheld the seizure of the camel head container with ammunition "because its 'incriminating character' was 'immediately apparent.'" *Id.* at 1035. "However," continued the court,

> when the agent came across the traffic tickets and the gang photos, he did not then have probable cause to seize them. He did not even know who the person named on the tickets was. He may have had a reasonable suspicion that the gang photos were evidence of crime, but he did not have the required probable cause. *See Arizona v. Hicks*, 480 U.S. 321, 326–27, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

*Id.; see also United States v. Bonitz*, 826 F.2d 954 (10th Cir.1987) (discovery of automatic rifle case, sears kits, M–16 bolt carrier and cans of gunpowder during the course of in-home arrest provided basis for officers to seek a search warrant from a magistrate but did not provide basis for officers themselves to conduct broad search of home nor to seize items which were not in plain view and which, although suspicious, were lawfully owned).

Applying these holdings to the present case would be difficult in even the best of circumstances. The task is further hampered here by the complete failure of the parties to argue the issues to the Court. Specifically, the government argues that the plain view exception applies here because the officers were conducting a lawful search for a small item that could have been anywhere in the room. The government then makes the blanket assertion that the items seized were "clearly incriminating." Citing the Air Force regulation which prohibits service members from "actively participating" in supremacist organizations and hate groups, the government is apparently arguing that the agents had probable cause to seize most of the unlisted items as evidence that Wick had violated this regulation, though the government has failed to even reference the probable cause standard. The government makes no attempt to justify the seizure of any of the individual items other than the drilling fixtures and, indeed, objected twice when the defense counsel attempted to ascertain why each item had been seized.

This is wholly insufficient to justify the seizure of 181 items not listed in the search warrant, including books, religious and political literature, and personal letters and papers. True, the officers were searching for a small object; but they were searching for a small *hard* object. This is not a case in which the sought after item could be hidden between pieces of paper or pages of a book or in an envelope, nor is it a case in which officers were authorized to search for specific documents, permitting them to closely inspect all papers in the home. The search warrant did not grant the officers blanket authority to carefully inspect every magazine, book, paper or video tape that they encountered. Their actions must therefore be explained. Moreover, the vast majority of the items seized are not "clearly incriminating." Specifically, the Court fails to see what is "clearly incriminating" about books with titles like "Rune Magic" and "Unconditional Freedom," nor what is

"clearly incriminating" about a personal letter from another serviceman. Indeed, it is disturbing to note that the officers seized from Wick's room items such as these which would not even fall within the scope of the much broader search authority granted for the storage locker. "Had a search warrant been issued authorizing such a broad seizure, it would have failed to meet the requirement under the Fourth Amendment that warrants particularly describe the things to be seized." *Abram,* 830 F.Supp. at 556. The government failed to even bring the majority of these items to the evidentiary hearing in order for the Court to ascertain whether they are "clearly incriminating." The government's attempt to justify this large scale seizure of unlisted items in one fell swoop falls far short of meeting its burden of proof.

Because the government has failed to specify which items it will actually seek to use as evidence in trial, the Court is compelled to go through each item individually to determine if it was properly seized and therefore admissible. The Court will begin with those items it concludes do fall within the plain view exception: (1) the two drilling fixtures; (2) the videocassettes on conversion of firearms to automatic fire; and (3) the five videocassettes entitled Cold Steele Proof.

■ Agent Youngs testified that he was searching the top shelf of the wardrobe in Wick's room when he encountered the drilling fixtures and stacks of videocassettes. Specifically, he stated that he was unable to see the contents of the shelf fully and that he was therefore removing the items on the shelf in order to view its contents. This was well within the permitted scope of the search for ammunition. Agent Youngs stated that he picked up the drilling fixtures from the top shelf and was able to read the instructions which identified the items through the plastic bags containing the fixtures. The Court concludes that this too is well within the permitted scope of inspection or "perusal" to determine whether an item discovered

during a lawful search is contraband. Because the drilling fixtures have no other purpose but for the conversion of firearms to fully automatic fire, the incriminating nature of the items was immediately apparent. Thus, the drilling fixtures are admissible under the plain view exception.

■ Likewise, Agent Youngs testified that while searching the wardrobe shelves, he removed the stacks of videocassettes. As he was moving the cassettes out of the way in the search for ammunition, Agent Youngs stated that he was able to read the titles of the tapes without further manipulating the items. The Court finds that Agent Youngs encountered these tapes within the scope of his lawful search for ammunition and that his brief persual of the tape titles was permisable. The titles of four of the tapes indicate that they provide instructions on the conversion of firearms to fully automatic fire. Thus, these four videocassettes were incriminating on their face, warranting their seizure.

■ Finally, Agent Youngs also encountered five identical videocassettes entitled Cold Steele Proof. Agent Youngs stated that he decided to seize these items after reading the description on the back of the videos which indicated that they provided instruction on the use of knives, possibly for fighting. It is not entirely clear that reading the back of these video tapes falls within the limited scope of perusal permitted to identify the item. However, the Court holds that under *Arizona v. Hicks,* reading the backs of the videocassettes encountered during a lawful search does not constitute a further invasion of Wick's privacy, just as simply reading serial numbers encountered during a search did not further invade Hick's privacy. *Hicks,* 480 U.S. at 324, 107 S.Ct. 1149. Because Agent Youngs was entitled to move the tapes in the course of his search for ammunition, he had legitimate access to the information contained on the back of the tapes. *Id.* at 325, 107 S.Ct. 1149. Further, the fact that Wick owned five identical videocassettes which may have provided instruction on knife fighting could be

considered incriminating evidence that Wick had violated the Air Force regulation against active participation in hate groups. "Active participation" is defined to include recruitment and training of members. Although Agent Youngs did not fully articulate this reason when testifying, the Court believes the "gist" of his testimony on this matter indicates that the agent concluded that owning five identical video tapes of this nature was indicative of Wick recruiting or training members for a hate group. Although, based on this evidence, it is a close question, the Court concludes that the five videocassettes were incriminating on their face and that Agent Youngs had probable cause to seize the tapes as evidence that Wick was recruiting or training members of a hate group.

The Court now turns to the items which it concludes do not fall within the plain view exception: (1) all of the books, magazines, and catalogs; (2) all the photographs and negatives; (3) the remaining videocassettes; (4) the cloth hand gun cases; and (5) all of the documents including the order invoices, the maps, the blueprint and instructions, the letter, and the rental contract for the storage locker.

██ Beginning with the books, magazines and catalogs, the government failed to provide the testimony of the OSI agent who found and seized most of these items. The record thus does not reflect how or where these items where encountered except that they were near Wick's bed and/or bookcase. The Court will assume, however, that the agents encountered these items in the course of their legitimate search for ammunition which could have been stored under the bed, behind books on a shelf, or in hollowed out books. Further, the Court concludes that the agents were entitled to briefly pursue the outside of the books and magazines in the course of their search and were entitled to open the books to determine if they had been hollowed out to hide ammunition.

However, the government has failed to establish that these items are inherently incriminatory. With regard to the nine books which were seized, the only explanation given as to the incriminatory nature of the books was that one had a swastika on the cover, three referred to shooting in the title, and one, the Army Officers' Guide, contained a phone number for a firearms part distributor written on the inside. The government failed to even proffer an explanation for the seizure of four of the books. Further, the Court finds that the explanations given for the seizures fall far short of establishing probable cause to seize the items. Specifically, it is unfortunately true that several popular works of fiction have swastikas on the cover; simply owning a paperback book with such a cover should not even rise to the level of "reasonable suspicion." Likewise, owning books about shooting and hunting is both perfectly legal and incredibly common. Similarly, while the phone number of the parts distributor inside the Army Officers' Guide might be deemed suspicious, it is not immediately or inherently incriminatory on its face. As with the 46 magazines and catalogs about guns and hunting which the agents seized, it must be recalled that gun ownership is still legal in this country and that an interest in guns and hunting is hardly surprising for someone serving in the armed forces. All of these items are on their face innocent, not incriminatory, even if they might be described as creating a suspicion in the officers' minds about Wick's activities. The Court emphasizes that the agents were not entitled to seize anything suspicious or anything which might help them in later investigations but only those items for which they had probable cause to conclude that the item was inherently incriminatory. *Robertson*, 21 F.3d at 1035.

In this vein, the government has also failed to provide a reasonable explanation for the seizure of the "Flashpoint Newsletter."[1] Agent Youngs testified that the

___

1. The Court also notes that the Newsletter was apparently found inside an envelope. The Court greatly doubts that, pursuant to

*Dickerson,* the agents were entitled to open an envelope that they immediately would have

newsletter touched on Timothy McVeigh and Theodore Kazinsky in some manner which Agent Youngs perceived as positive and therefore suspicious. The government argues that this is evidence of Wick's active participation in a hate group. However, as noted, the Air Force defines "active participation" to include only such actions as protesting, rallying, recruiting, fundraising and training. Agent Youngs, when asked on cross-examination, specifically stated that the he did not consider the Newsletter or any of the other books or magazines seized as evidence of *active* participation. Thus, at most, the Newsletter may be considered suspicious and indicative that Wick is sympathetic with supremacist causes. But, on its face it is not inherently incriminatory. Rather, on its face it is politically oriented literature, the seizure of which greatly offends the First Amendment.

Because The agents lacked probable cause to seize any of the books, magazines or catalogs taken from Wick's room, all of these items must be suppressed. *Id.*

 As to the photographs, the Court will again assume that these items were encountered within the legitimate scope of the search for ammunition and that the agents were permitted to briefly peruse them in the course of their search. However, the government has again failed to demonstrate that the items are incriminatory on their face. With regard to the "sixty-one photographs and fourteen negatives," Agent Youngs testified that this was in fact a single roll of undeveloped film seized from Wick's room. It should be obvious that a roll of undeveloped film is not inherently incriminating. With regard to the 17 other photos seized, the only photos which might even be deemed suspicious are the nine photos of an individual shooting an assault rifle. However, Agent Youngs testified that the agents did not know who the individual in the photos

was and that he could not tell from the photos whether the rifle had been altered to fully automatic fire. If the photos of individuals displaying known gang signs in *Robertson* were not inherently incriminating but merely suspicious, then these photos as well fall short of the standard for seizure under the plain view doctrine. *Robertson,* 21 F.3d at 1035. Therefore, all of the photographs and negatives must be suppressed. *Id.*

 Turning to the remaining videocassettes, the Court again assumes that the tapes were encountered within the scope of the legitimate search for ammunition and that the Agents were entitled to briefly peruse the titles of the tapes. Agent Youngs testified that the four remaining tapes were maintenance and technical manuals for certain firearms. Neither the videos nor the firearms they referred to are illegal to own. Again, while the tapes may have stirred suspicion in the officers' minds, the government has not established probable cause to conclude that they are in any manner incriminating. Therefore, the remaining four videocassettes must be suppressed. *Robertson,* 21 F.3d at 1035.

 With regard to the four cloth hand gun cases, the Court finds that the cases were encountered during the course of the legitimate search for ammunition and that the agents were entitled to open and inspect the cases to determine if they contained ammunition. Agent Youngs testified that the cases were seized based on Agent Shilaikis' conclusion that the cases showed the impression of guns, indicating that the cases recently contained guns. The government has failed to explain what is incriminating about this. No guns were in fact found in Wick's room and again, the Court observes that it is still legal for Wick to own guns as long as they were not stored in his on-base room. Further,

known did not contain ammunition. The Court doubts even more that the agents were entitled to remove the papers inside and then read them. However, given that the Court

finds that the document is not incriminatory on its face, the Court does not reach this issue here.

there has been no evidence presented that hand guns can be altered to fully automatic fire or that hand gun parts can be used to alter assault rifles to fully automatic fire. Thus, the government has failed to establish that the hand gun cases are inherently incriminating and the items must be suppressed. *Robertson*, 21 F.3d at 1035.

■ Finally, and most significant to this case, are the individual documents seized from Wick's room: the five order invoices, the blueprint and instructions for the Drop–in–Auto Sears, the five maps of Amarillo, TX, the letter from Airman First Class Draisen, and the lease contract for A–Key Storage. With regard to the order invoices, the government failed to provide the testimony of the agent that discovered and seized these documents. Defense counsel suggested that the documents were found in a stack of loose papers, but no evidence on this point was presented. Because the agents' authority to search was limited to ammunition and ammunition parts, the agents were not entitled to leaf through pieces of paper which could not have hidden a bullet. Further, the agents were not entitled to closely inspect these documents beyond what was necessary to determine that they were not ammunition. *See Dickerson*, 508 U.S. at 378, 113 S.Ct. 2130; *Padilla*, 986 F.Supp. at 170–71. Here, the Court simply has insufficient information to determine whether the order invoices were encountered within the legitimate scope of the agent's search for ammunition or whether the agent went beyond the permitted scope of search, leafing through personal papers which could not have hidden a bullet. Thus, the government has failed to carry its burden of proof in establishing that the invoices were discovered in plain view. *See Dickerson*, 508 U.S. at 378, 113 S.Ct. 2130; *Padilla*, 986 F.Supp. at 170–71.

■ On the other hand, Agent Youngs testified regarding his seizure of the blueprint and instructions for the Drop–in–Auto Sears. Agent Youngs testified that he found both the blueprint and the instructions folded on a shelf in the wardrobe. As soon as Agent Youngs picked up these papers, it must have been immediately apparent that they were not ammunition and did not contain ammunition. In order to determine what the these documents were, Agent Youngs had to unfold and further inspect the documents. In so doing, Agent Youngs exceeded the permissible scope of the search for ammunition and further invaded Wick's privacy. *See Dickerson*, 508 U.S. at 378, 113 S.Ct. 2130; *Hicks*, 480 U.S. at 324, 107 S.Ct. 1149. Accordingly, these documents were not found in plain-view, were not inherently incriminating, and should not have been seized.

The same conclusion is compelled regarding the five maps of Amarillo, TX. Agent Youngs testified that when the maps were found they were folded. Again, it must have been immediately apparent that they were not ammunition and did not contain ammunition. To identify the documents, the agents had to unfold and further inspect them. In so doing, the agents again exceeded the permissible scope of the search for ammunition and further invaded Wick's privacy. *See Dickerson*, 508 U.S. at 378, 113 S.Ct. 2130; *Hicks*, 480 U.S. at 324, 107 S.Ct. 1149. Accordingly, these documents were not found in plain-view, were not inherently incriminating, and should not have been seized.

■ As to the letter from Airman Draisen, the government failed to present any evidence regarding the circumstances of its discovery. The letter may have been folded and may have been in an envelope, but Agent Youngs could not recall. Thus, the Court concludes that the government has failed to establish that this document was encountered in plain-view. More importantly, however, the proffered "incriminatory" nature of the letter is nothing more than the fact that it showed that Airman Draisen was an "acquaintance" of Wick's. This, the Court must observe, is one of the most egregious violation of the

Fourth Amendment imaginable. Law enforcement officers entering a person's home under the guise of a narrowly drawn warrant, reading through the individual's personal letters, and then seizing one of those letters solely because it demonstrated that the writer was an "acquaintance" of the suspected man is the very evil which the Fourth Amendment's particularity requirement is intended to guard against. *Dickerson,* 508 U.S. at 376, 113 S.Ct. 2130; *Andresen,* 427 U.S. at 482, 96 S.Ct. 2737. In the words of the Supreme Court, this is an "excessively speculative seizure," the likes of which should not be seen. *Dickerson,* 508 U.S. at 376, 113 S.Ct. 2130. The letter should not have been seized, in all likelihood should not have been read, and will be suppressed.

▆▆▆▆ Finally, the Court turns to perhaps the single most important document seized from Wick's room: the rental agreement for the storage locker. Agent Youngs testified that he discovered the rental agreement inside a plastic tuperware-style container as he was searching for ammunition. He stated that when he opened the container, the document was laying on top, folded in such a manner that he could read the title of the document and the name and address of John Wick without further manipulating the document. Based on this testimony, the Court finds that the document was discovered within the scope of the legitimate search for ammunition and that this brief perusal was permitted to identify the document once it was discovered. However, the document is not inherently incriminatory. Undoubtedly, the rental agreement would be useful in pursuing further investigation of Wick. But the agents were not entitled to seize anything that might be useful to them. And undoubtedly, a reasonably competent officer would suspect that a storage locker might contain incriminatory materials. But this does not amount to probable cause to believe that the document itself is inherently incriminatory. Indeed, in the present case, the fact that Wick rented a storage locker was highly exculpatory. Wick was suspected of storing ammunition in his on-base room in violation of Air Force regulations. If, however, Wick was storing the ammunition in an off-base storage locker, that would establish that he was in fact innocent of the alleged offense. Moreover, the Court does not find it unusual or suspicious that a service member, living in a small dormitory style room, would rent a storage locker. Again, there is nothing inherently incriminating about simply renting a storage locker, though undeniably it is a useful investigative lead. But, absent probable cause to conclude that the document itself was inherently incriminating, the agents could not seize the rental agreement. *Robertson,* 21 F.3d at 1035.

Accordingly, all of the documents seized must be suppressed as the government has not established that they were discovered within the scope of the legitimate search for ammunition or because they are not inherently incriminating. *Id.*

### 3. Fruit of the Poisonous Tree

▆▆▆ Having concluded that many of the items seized from Wick's room were taken in violation of the Fourth Amendment, the Court must now determine the effect this has on the subsequent search of Wick's storage locker. The central question is whether, in light of the fact that the agents were not entitled to seize the rental contract for the storage locker, the entire second search is tainted.

The Court is compelled to conclude that it is. Although Agent Youngs legitimately encountered the rental agreement and thus legitimately gained knowledge of the existence of the storage locker, he was not entitled to seize the agreement itself. The law enforcement agents in fact used the agreement in order to obtain the second search warrant for the storage locker. Thus, the conclusion is inescapable that the officers exploited the illegally seized document in obtaining the search warrant for the storage locker. *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Because

all of the evidence from the storage locker "has been come at by exploitation of [the] illegality," all of the items seized must be suppressed unless an exception to the exclusionary rule applies. *Id.*[2]

### 4. Inevitable Discovery

 Even if evidence has been acquired through law enforcement exploitation of illegality, the evidence may nevertheless be admitted if it falls within the inevitable discovery exception to the exclusionary rule. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). "Under this rule, the government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." *United States v. Eylicio–Montoya,* 70 F.3d 1158, 1165 (10th Cir.1995); *Nix,* 467 U.S. at 444 n. 5, 104 S.Ct. 2501; *United States v. Griffin,* 48 F.3d 1147, 1150 (10th Cir.1995); *United States v. Maestas,* 2 F.3d 1485, 1491 (10th Cir.1993). "Accordingly, as long as it can be shown by 'demonstrated historical facts' that an independent and untainted discovery would inevitably have occurred, the evidence will be admissible." *Griffin,* 48 F.3d at 1150 (citation omitted); *see also United States v. Polanco,* 93 F.3d 555, 562 (9th Cir.1996) ("the government must prove that the fact or likelihood that makes the discovery inevitable arose from circumstances other than those disclosed by the illegal search itself.") The impetus behind the doctrine is to place "the police in the same, not a worse, position that they would have been if no police error or misconduct had occurred." *Nix,* 467 U.S. at 443, 104 S.Ct. 2501. The Tenth Circuit recently clarified that the independent investigation need not be underway at the time of the

illegality. *United States v. Larsen,* 127 F.3d 984, 986 (10th Cir.1997). Rather, the rule applies "whenever an independent investigation would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct." *Id.* at 986.

The doctrine of inevitable discovery has its most sensible application in situations where officers conduct an illegal search but would have been permitted to lawfully search the same area on a different theory, such as an inventory search or a search incident to arrest. *See United States v. Haro–Salcedo,* 107 F.3d 769, 773 (10th Cir. 1997); *Eylicio–Montoya,* 70 F.3d at 1165–66; *United States v. Romero,* 692 F.2d 699, 704 (10th Cir.1982). On the other hand, in *United States v. Owens,* 782 F.2d 146, 152–53 (10th Cir.1986), the Court of Appeals rejected as "too speculative" the argument that drugs would have been found inevitably when the hotel staff cleaned the defendant's room. The court observed, "we are reminded of our cautionary statement in *Romero:* 'We recognize the danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway.'" *Id.* (quoting *United States v. Romero,* 692 F.2d 699, 704 (10th Cir.1982)). Indeed, in *Romero,* the court stated that illegally seized evidence was admissible under the inevitable discovery doctrine "if there is *no doubt* that the police would have lawfully discovered the evidence later." *Romero,* 692 F.2d at 704 (emphasis added).

 The Court believes that inevitable discovery might apply to the evidence seized from the storage locker. Specifically, because the agents legitimately encoun-

---

2. In the interest of creating a clear record for appellate review, the Court notes that if the officers were entitled to use the rental contract in obtaining the second warrant, the Court would conclude that the second warrant was supported by probable cause, even if the Court were to exclude from the assessment all of the other items illegally seized from Wick's room which are mentioned in the

affidavit. Specifically, the Court finds that the drilling fixtures, instructional videocassettes on weapons conversion, and ammunition found in the room, combined with the information regarding the UPS packages received by Wick from firearms parts distributors, would have provided probable cause to support the issuance of the second search warrant.

tered the information that Wick did in fact have a storage locker, there is reason to believe that they would have pursued this lead, even if they did not illegally seize and use the rental agreement itself. Alternatively, it is not difficult to imagine that reasonable officers, in the normal course of their investigation, would have determined whether Wick rented a storage locker near the base.

However, the government failed to raise the inevitable discovery exception and failed to present any evidence on this point. The Court has been unable to find any authority, published or not, on whether the Court may even consider inevitable discovery *sua sponte*. Cf. *Polanco,* 93 F.3d at 560–62 (court does not decide if trial could admit evidence *sua sponte* under inevitable discovery because admission of statement under the doctrine was error regardless); *United States v. Marez,* 19 F.3d 31, 1994 WL 83383 (9th Cir.1994) (reversing *sua sponte* admission of evidence under inevitable discovery because there was no evidence in the record to support admission under the doctrine). When the argument is raised for the first time on appeal and not supported by the record, the Tenth Circuit generally declines to entertain it. *United States v. Moore,* 91 F.3d 96, 99 (10th Cir.1996); *Eylicio–Montoya,* 70 F.3d at 1166.

Even if the Court were to conclude that it could consider admissibility under the inevitable discovery doctrine absent argument to such effect by the government, the Court finds that in the present case there is no evidence in the record which would demonstrate that the officers would have inevitably discovered and searched the storage locker. The Court cannot admit "unlawfully obtained evidence on the strength of [it's own] speculation that it would have been discovered legally anyway." *Owens,* 782 F.2d at 152–53; *Romero,* 692 F.2d at 704. Because the government has failed to produce facts sufficient to support the inference of inevitable discovery by a preponderance of the evidence, the Court holds that the evidence seized from the search of the storage locker must be suppressed. *Eylicio–Montoya,* 70 F.3d at 1165; *Griffin,* 48 F.3d at 1150; *Owens,* 782 F.2d at 152–53.

As noted above, the Court believes that the officers in this case were acting in good faith, attempting to seize only those items which they found indicative of something suspicious. But, the Court must also conclude that the officers' sense of restraint was overcome by their fears and suspicions. Agent Youngs testified many times at the evidentiary hearing that the search of Wick's room occurred only a few days prior to the anniversary of the bombing of the Oklahoma Federal Building and the destruction of the Waco compound, and that this fact influenced their impressions of what they saw in Wick's room. This is one of the very reasons the Fourth Amendment requires the intervention of a neutral, detached magistrate, to insure that any invasion of an individual's privacy is guided by reason and judgment not merely by fear and suspicion. While the officers may have had good cause to seek a warrant for the seizure of additional items from Wick's room, they were not free to use their own discretion to decide what should be seized. We cannot let this become a society in which law enforcement officers are free to seize books, photographs and personal papers at will based on vague suspicions that an individual is involved in a political movement which may be dangerous. We cannot sacrifice our freedom to our fear.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress [**Doc. No. 12**] is hereby **GRANTED IN PART.** The following items are hereby suppressed:

1. All books, magazines and catalogs seized from Wick's room (search inventory tag numbers 1, 5, 6, 7, 8, 10 and 16).

2. All photographs, negatives and undeveloped film seized from Wick's room (search inventory tag numbers 17 and 20).

3. The following videocassettes:

a. MAKAROV Armorer's Course Maintenance and Technical Manual (search inventory tag number 2);

b. H & K Armorer's Course Maintenance and Technical Manual (search inventory tag number 2);

c. Browning Hi-power Armorer's Course Maintenance and Technical Manual (search inventory tag number 2); and

d. Colt–1911 .45 Auto, Armorer's Course Maintenance and Technical Manual (search inventory tag number 2).

4. The four cloth hand gun cases (search inventory tag number 4).

5. The five order invoices (search inventory tag number 11).

6. The blueprint and instructions for Drop–in–Auto Sears (search inventory tag number 12).

7. The five maps of Amarillo, TX (search inventory tag number 13).

8. The lease contract for A–KEY Storage (search inventory tag number 14).

9. The letter from A1C Draisen (search inventory tag number 15).

10. All items seized in the search of the A–KEY Storage unit leased to Wick.

The following items are not suppressed:

1. The two drilling fixtures and instructions (search inventory tag number 3).

2. The following videocassettes:

a. AR15 Armorer's Course Maintenance and Technical Manual (search inventory tag number 2);

b. AKS and MAK90 Type Armorer's Course Maintenance and Technical Manual (search inventory tag number 2);

c. The five video cassettes titled Cold Steele Proof (search inventory tag number 9);

d. AKS to AK–47 Conversion (search inventory tag number 19); and

e. AR–15 to M–16 Conversion (search inventory tag number 19).

3. The five AK–47 bullets (search inventory tag number 18).